UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, Case No. 2:24-CR-595-JWH-4

Plaintiff,

v.

AHMED HOSSAM ELDIN ELBADAWY, et al.,

Defendants.

# EXHIBIT A

Psychological Evaluation of Joel Martin Evans

# HY MALINEK, Psy.D., Inc.

CLINICAL AND FORENSIC PSYCHOLOGY CORPORATION

337 SOUTH BEVERLY DRIVE #208, BEVERLY HILLS, CA 90212

Tel: 310-551-1345, Fax: 310-388-1454, DrMalinek@protonmail.com


***Confidential: It is not recommended that a copy of this report be shown to Mr. Evans or his family.***

07/31/2026

## PSYCHOLOGICAL EVALUATION REPORT

| | |
|---|---|
| Name: | **Joel Martin Evans** |
| Case Number: | 2:24-CR00595 |
| Age: | 27 (05/27/1999) |
| Date of Evaluation: | 07/02/2026 |
| Referred by: | Daniel Perlman, Attorney at Law |

## REASON FOR REFERRAL:

Mr. Evans recently pled guilty to Count One of the indictment in the matter of the United States v. Ahmed Elbadawy et al, which charges him (and three others) with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Mr. Perlman referred Mr. Evans for an evaluation of his mental state as well as the potential risk for criminal recidivism.

## EXAMINER QUALIFICATIONS AND SOURCES OF DATA:

I am a clinical and forensic psychologist with 36 years of clinical experience. I have been licensed in California since 1988, have been a member of the Los Angeles Superior Court and multiple other expert panels since 1994, and have conducted well over 5,000 evaluations in both civil and criminal contexts over the years. I have evaluated several thousand individuals in both state and federal courts who have been accused of various crimes.

In the past I consulted with the California department of Mental Health and supervised and trained psychologists on diagnosis and risk assessment of violent offenders. Since 2010, I have also consulted with the civil commitment unit of the U.S. Attorney's Office and have been appointed by federal judges and lawyers nationwide in cases involving diagnosis and risk assessment. I have been recognized as an expert in multiple states and have testified more than 450 times for both prosecution and defense in both state and federal courts.

I interviewed and tested Mr. Evans remotely from North Carolina on 07/02/2026 for approximately 3-1/2 hours. I conducted a mental status examination, obtained relevant psychosocial history, and queried him quite extensively regarding his participation in the crime which involved three other individuals. I administered two personality tests. These included the Minnesota Multiphasic Personality Inventory-3 (MMPI-3) and the Millon Clinical Multiaxial Inventory-IV (MCMI-IV). Both are comprehensive and research supported personality tests which have been backed up by a great deal of research. The tests were scored by Pearson Assessments, the tests' developer, and publisher. I also consulted Pearson Assessments in developing interpretive hypotheses associated with the protocols obtained by Mr. Evans. In assessing the risk that Mr. Evans will re-offend, I administered a quantitative survey of offenders' risk, attributes and situations which are relevant to decision making regarding the level of service they require (LS/CMI) as well as a measure of protective (low risk) factors which has been cross validated (SAPROF).

The office of Mr. Perlman provided a copy of the indictment and the plea agreement in this matter. On 7/31/26, I spoke with Cletis Evans, Mr. Evans' father, in an effort to obtain additional family history.

**PSYCHOLOGICAL-LEGAL ISSUES:**

1. Is there evidence of a mental disorder?
2. Is Mr. Evans likely to re-offend?

**SUMMARY OF RELEVANT COLLATERAL INFORMATION:**

The defendant in this case is a 27-year-old Caucasian man who has recently pled guilty to count one of the indictment in the matter in which he and three other individuals were charged with conspiracy to commit wire fraud, aggravated identity theft, and criminal forfeiture. The incidents in this case occurred between 2021 and 2023.

According to the indictment which was filed on 10/08/2024, "the conspirators were members of a loosely organized, financially motivated, cyber criminal group whose members primarily target large companies and their contracted telecommunications, information technology, and business process. The group employed a variety of social engineering techniques including short messaging services (SMS), phishing to fraudulently obtain credentials of company employees in order to gain unauthorized access to employee accounts and the company's computer and stealing confidential victim data."

The members of this group "used information obtained from company intrusions to gain access to virtual currency accounts and wallets and stole substantial virtual currency". According to the indictment, "defendant Evans was an administrator of a telegram channel that received fraudulently obtained log in credentials from victim company employees." It was also alleged that on 05/14/2022, he accessed an account used to register a phishing website. Mr. Evans has never been in trouble with the law before or after these incidents.

I interviewed his father on 7/31/26, and confirmed the history provided by Mr. Evans. The father noted that Joel has taken full responsibility for his conduct in this case, truly regrets his involvement in this case, gets along well with all members of his family and enjoys their support. The father notes his belief that "Joel has never been exposed to anything real world before and therefore failed to appreciate the consequences of his conduct but now he does".

**MENTAL STATUS EXAMINATION AND BEHAVIORAL OBSERVATIONS:**

I examined Mr. Evans remotely from North Carolina for approximately 3-1/2 hours. He was consistently cooperative and compliant and openly acknowledged his involvement in this matter. He was in a good mood and did not demonstrate any evidence of gross or subtle mental status abnormalities. I estimate his intelligence in the average range. Insight seemed emotionally naive. His judgment was obviously poor judging from the current information. There is no evidence of impulse control breakdowns notwithstanding his poor judgment in this matter.

**INTERVIEW DATA:**

Mr. Evans stated that he was born in Okinawa, Japan, where his father served in the Marines at the time. The family moved to the United States when he was a year old. He stated that his father is 59 and his mother is 56. They separated when he was six and divorced when he was seven. Both remarried. The father reportedly retired 21 years ago. Joel has one brother who is five years older and one sister who is seven years older. He described his father as outgoing and noted that his father likes to meet people and has actively run various charities. At one point his father reportedly ran the charity Toys for Tots and was heading its Louisville chapter. The father has also volunteered in the Salvation Army.

Mr. Evans described his father as “stubborn but a good man who has always been there for us.” He stated that his mother is an insurance agent and that “she is doing everything to help us.” He noted that his mother is a prominent figure in her church and is quite religious. He stated that he gets along well with both parents and has a “solid relationship with the family.”

Mr. Evans stated that he grew up mostly in North Carolina although he lived in Florida in 2021 for approximately six months with friends. At one point he lived in Kentucky with his brother and father for 2-1/2 or 3 years. He is healthy and does not take any medication. He noted that he stands 5 feet 10 inches tall and weighs 260 pounds. He recalled that at one point when he was 21, his weight dropped to 160 while he was fasting but noted that since he has gotten back with a girlfriend he has “added weight.” He stated that he uses alcohol “sporadically, only at social events.” He used to smoke weed. He recalled trying Adderall at school.

Mr. Evans completed high school but acknowledged that during the last 2 years of high school he “was lazy and did not work too hard”. He wishes he did better in school. He has had a girlfriend for 4-1/2 years (Melanie) and has lived with her and her son (Delson) who he regards as his own. He noted that Melanie used to clean houses and presently works at a day care facility. . He has never been in trouble with the law before.

At the time of our interview, Mr. Evans was working as an insurance agent in his mother’s family business. He stated that he previously worked as a free-lance software developer and built websites. He stated that he had taught himself computers since middle school and supported himself by working as a free-lance software developer and doing “gaming related stuff.”

I asked about his conduct in this case. Mr. Evans stated that while in high school he “played a lot of computer games and learned coding” and that while playing computer games “you meet a lot of people”. He recalled developing a side business of running game servers. He stated that the only individual he knows and had contact with from the codefendants in this matter is Mr. Buchanan, with whom he had played “Counter Strike” and communicated with. Mr. Evans stated that he knew that Mr. Buchanan was “a SIM swapper,” that is, an individual who uses social

engineering to acquire SIM cards of individuals and then take control of their phones.

He stated that in this case, Mr. Buchanan approached him and asked him to write a python script, that is, prepare certain instructions in the python language, "like a website that will capture people's information" .He added that by mimicking the victim company's websites it was possible to obtain information about the employees of these companies. He stated that he "made the phishing tool kit" and was occasionally paid by Buchanan. Mr. Evans stated that his involvement in this matter lasted no more than two months. He acknowledged that he had prepared "a tool kit" which the co-conspirators placed on their later servers and said that he had administered the telegram channel.

Mr. Evans stated at the time of the incidents he was "short of money and fighting to survive." He acknowledged that he "saw a challenge here, knew that this is nefarious but never knew the scale" that his codefendants "went with it". He stated that he strongly regrets his participation in this case and knows that "this is not a victimless crime…Individuals were affected." Mr. Evans emphasized that he has never violated the law before and is sure that he "won't ever break the law again."

**PSYCHOLOGICAL TESTING- RESULTS AND INTERPRETATION:**

**The MMPI** is perhaps the most widely used measure of personality and emotional functioning on the market. The test has been around for more than 70 years and has received a great deal of research support and cross-validation. The MMPI-3, its latest version, includes 335 true/false items and has several test-taking and validity "checks", which help ascertain the validity of the resulting protocols and the truthfulness of respondents. I administered it in an effort to assemble a wider range of hypotheses regarding Mr. Evans's current personality and emotional functioning.

Inspection of Mr. Evans' scores on test taking and attitude checks raised some concerns about the possible impact of under reporting on the validity of the protocol. With that caution noted, there were no indications of somatic or cognitive symptoms or of emotional, thought, behavioral, or interpersonal dysfunction.

**The MCMI- IV** is another research supported personality test. This test has been normed on patients who were in the early phases of assessment or psychotherapy for emotional discomfort or social difficulties. The MCMI consists of 195 true/false items, and, like the MMPI-3, includes test-taking validity "checks", designed to assess the consistency and veracity of respondents. Unlike the MMPI-3, which focuses more on current mental state, the MCMI-IV looks more at long-term personality characteristics.

Examination of Mr. Evans' scores on the validity "checks" revealed a distinct tendency towards avoiding self-disclosure which probably reflected Mr. Evans' emotional naivete and anxiety about the forensic contents of the examination. It was also probably related to his own lack of introspection and psychological mindedness. The profile he obtained did not reveal any evidence of significant psychopathology and there was no evidence of antisocial or narcissistic traits, or of any distinct psychiatric diagnoses.

Rather, Mr. Evans answers reflected an attention seeking and opportunistic social style and a

tendency to handle serious matters in a glib and nonchalant matter. He tested as emotionally naive and has an air of gregariousness and unrealistic optimism which may adversely affect his capacity to handle stresses or problems. In all likelihood, the idea of being seen as troubled or vulnerable would distress him a great deal.

Some similar profiles have been seen in individuals who tend to avoid deeper and more serious matters and whose interpersonal relationships are generally shallow. Many are ill-inclined to address conflict and show a penchant for momentary excitement and a lack of tolerance for frustration. It is unlikely that his interpersonal conduct and possibly careless disregard for others' rights are hostile and malicious. Rather, this tendency likely derives from his flighty interaction style, unrealistically optimistic attitude and superficial processing of information.

**RISK ASSESSMENT:**

Research on recidivism often considers the presence of a prior criminal history, demographic titles such as age, a history of trauma, and substance abuse. Individuals with prominent narcissist or antisocial personalities as well as psychopathic traits are often seen as more likely to re-offend. In this case, there is no evidence of prior criminal history and certainly not of antisocial or narcissistic traits. Rather, Mr. Evans presents (and tests) as glib, overly optimistic, ill-inclined to deeply think about the meaning and potential consequences of his conduct, and quite affable.

He clearly takes responsibility for his conduct in this case and understands its implications. He also recognizes that at the time of the crime five years ago he knew and was able to appreciate that his conduct was wrong. It does appear that he now fully appreciates that this, as he had said, "was not a victimless crime" and that his conduct facilitated criminal activity. The regret and remorse he expressed seems genuine.

**The LS/CMI (Level of Service/ Case Management Inventory) is** a quantitative survey of offenders' attributes and situations relevant to decision-making regarding level of service**.** The LS/CMI involves a detailed survey of risk and need factors and is designed to assist professionals in management and treatment planning. The LS/CMI targets 8 criminogenic needs/risk areas. Research has shown that targeting dynamic aspects of major risk factors has been found to reduce recidivism.

Mr. Evans' overall score on the LS/CMI was 1 placing him in the very low segment of the risk/needs area for general criminal recidivism. The following table shows Mr. Evans' scores and risk/need level in the eight target categories.

| I. CATEGORY | SCORE | RISK/NEED LEVEL |
|---|---|---|
| Criminal History (prior offenses) | 0 | Very low |
| Education/Employment | 0 | Very low |
| Family/Marital | 0 | Very low |
| Leisure/Recreation | 0 | Very low |
| Companions | 1 | Low |

| | | |
|---|---|---|
| Alcohol/Drug Problem | 0 | Very low |
| Pro-criminal Attitude/Orientation | 0 | Very low |
| Antisocial Pattern | 0 | Very low |
| **Total Risk Score** | **1** | **Very Low Risk** |

According to the manual's interpretation guidelines for incarcerated offenders (page 36 in the manual), total risk scores between 0 and 5 have been associated with 0% likelihood of recidivism. Note that the 0% figure is not Mr. Evans' absolute and individualized risk. Rather, it is the risk of the entire group of individuals who score in the same range. Under "supervision options" for individuals who score in that range, the authors recommend, "consider early release or community residential placement."

**SAPROF**

I also utilized the Structured Assessment of Protective Factors for Violence Risk (SAPROF)**,** a measure of protective (low risk) .The SAPROF contains 17 protective factors which are organized within three scales:

- **Internal protective factors:**
  Intelligence, secure attachment in childhood, empathy, coping, self-control

- **Motivational protective factors**:
  Work, leisure activities, financial management, motivation for treatment, attitude towards authority, life goals, medication.

- **External protective factors:**
  Social network, intimate relationship, professional care, living circumstances, external controls.

**The internal protective factors** on this scale underscore individual characteristic from the individual's past and current functioning that protect against violence. The ability to cope adequately with the negative effects of stress and to control the expression of impulsive, undesirable behaviors in favor of goal-directed activity are particularly protective of risk for recidivism. In this case, review of the totality of the database and the information about Mr. Evans certainly suggests that he is intelligent. There is no evidence of childhood trauma, and he is capable of empathy, enduring attachment and self-control. It appears that his involvement in the index offense was time limited.

Moving to "**Protective Motivational Factors**," items in this domain emphasize one's motivation to engage in prosocial pursuits. Factors such as regular work, involvement in supervised leisure activities and positive life goals contribute to a structured life and meaningful approach to daily activities and reduce the likelihood of criminal recidivism.

In this case, Mr. Evans has not experienced any difficulties in maintaining employment and there is no evidence of antisocial pattern or resistance to authority.

Turning to **External Protective Factors, t**hese items on the SAPROF refer to environmental obstacles to criminal conduct or "buffers" against recidivism. These voluntary or imposed conditions embody external sources of control that protect an individual from engaging in sexually inappropriate behavior. Specific factors include a positive social network, stable intimate relationships, access to professional psychological care, living circumstances, intensive supervision by professionals and restrictions on the individual's freedom.

Mr. Evans has maintained steady contact with his family and describes his relationship with both parents in positive terms. Both parents appear motivated to assist him. He has had a stable 4-1/2-year relationship. Overall, the results of the SAPROF indicate that Mr. Evans will have a high level of protection if conditionally released.

**SUMMARY OF RISK FORUMLATION**

Mr. Evans' involvement in this case represents a single point of contact with the criminal justice system. He has never been in trouble with the law in the past. There is no evidence of antisocial, narcissistic, or psychopathic traits. He describes "solid family support", has maintained a lengthy intimate relationship and has taken responsibility for his conduct.

He presents and tests as emotionally naive, glib, and affable. There is an air of gregariousness and unrealistic optimism which likely contributes to a tendency to handle serious matters in a glib and nonchalant manner. It is unlikely that his somewhat careless disregard for others' rights stems from hostile or malicious character. Rather, they are likely the product of his flighty interaction style and unrealistically optimistic attitude.

Mr. Evans' conduct appears to have been driven less by antisocial values than by immaturity, immersion in an online peer culture that normalized criminal conduct, fascination with technical problem solving, and a profound failure to appreciate the foreseeable human consequences of providing technical assistance to more sophisticated offenders. His psychological profile does not suggest an enduring criminal identity but rather a situational lapse in judgment that is unlikely to recur now that he has experienced the real-world consequences of his conduct.

I note that he has never been in trouble with the law in the past and that many of the criminologic risk factors which have been associated with recidivism are absent in this case (for example, antisocial personality disorder, violent ideation, psychopathy). Results of a measure which looks at offenders' risk, needs and proper dispositions appear to support conditional release. There are several protective (low risk) factors in this matter which include steady family support, intelligence, stable and secure relationships, ability to solve problems, and generally adequate self-control.

Overall, and because of the concerns about his involvement in this case, I recommend that any disposition in this matter involves mandatory participation in counseling for a minimum of one year. Hopefully, Mr. Evans will take such opportunity to further explore the feelings and thoughts that have contributed to his involvement in this matter, and both develop and solidify relapse prevention mechanisms which could safeguard against similar conduct in the future.

Respectfully Submitted,

HY MALINEK, Psy.D
Licensed Psychologist
License# PSY 10667

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

AHMED HOSSAM ELDIN ELBADAWY, et al.,

Defendants.

Case No. 2:24-CR-595-JWH-4

# EXHIBIT B

Letter of Joel Martin Evans to Judge Holcomb

The Honorable Judge John W. Holcomb
Ronald Reagan Federal Building
411 W. 4th Street
Santa Ana, California 92701

Re: United States v. Elbadawy, Case No. 2:24-cr-00595-JWH

Your Honor,

I stand before this Court having pleaded guilty to conspiring to deceive individuals into surrendering their credentials, which were then used to steal cryptocurrency and personal information. I do not dispute my actions, nor do I seek to minimize them. I take complete ownership of what I have done. From the moment my conduct was brought to light, I chose to cooperate immediately and plead guilty quickly. I recognized the severity of my wrongdoing, and I wanted to do everything in my power to help right those wrongs, which included assisting the government in securing the arrests of other involved individuals and to do everything in my power to ensure all victims receive full restitution.

My actions caused direct, severe, and lasting harm to real people and businesses, and for that, I am deeply sorry. While I have never had my own assets stolen, I know firsthand the crushing weight of financial hardship. It is deeply disturbing to know that I willfully inflicted that same hardship onto others, along with an immense emotional toll and the erosion of trust that is so difficult to rebuild.

Beyond the direct victims of my crimes, I have damaged relationships with my own family, who had done nothing but love, guide, and support me. They did not raise me to act with such disregard for others, and bearing the weight of their disappointment is a heavy consequence of my choices.

There are no excuses for what I did, and I offer none. I take full and complete responsibility. When I reflect on the harm I caused to real people with real lives, I am genuinely overcome with emotion. I am profoundly sorry. More than anything, I wish I could undo the damage I have caused.

Before arriving at this turning point, I operated with a profound lack awareness regarding the scope of my actions-failing to consider who I was hurting or how deeply. That is not who I am today. The process of facing this Court, cooperating with authorities, and examining my own flaws has been a hard and humbling experience. I have done the painful work of self-reflection, and I have fundamentally changed.

I now lead my life with genuine care, transparency, and respect for the people around me. My goal in every daily interaction, whether with a customer, a neighbor, or a stranger, is to leave that person better than I found them. I measure my worth now by the positivity, honesty, and support I can offer others, not by what I can deceptively take.

Authentisign ID: C763B7F8-B695-F111-9B33-000D3A4FE82A


Family is the foundation of everything I am. My father actively engages with several veteran service, non-profit organizations, dedicating his time to uplifting our community. Inspired by his example, I am working to redirect my life toward a path of service.

My mother owns Wagoner insurance agency, and she has dedicated over 15 years of her life to this business and sets the true example of taking care of people. As her employee, I am striving to emulate her by creating my own work ethic, attention to detail, and building new and preserving existing customer relationships to that business every day.

My siblings look to me as an outlet and a source of shared memories and with them, I have volunteered at Salem Baptist Church and the Yopp's Meeting House. I have volunteered at events where my grandfather, who heads up a veteran based organization called the SPEARiT Veteran Fishing Project, that assists veterans with severe PTSD with a fishing expedition out on the ocean.

I have also built my own family. I share a home with my girlfriend, Melanie, and her seven-year-old son, Delson, whom I have helped raise and provide for daily over the last 4 years. Across all these relationships, I strive to be a source of positivity, dependability, and genuine support. These people depend on me, and that responsibility is what motivates me to be better every single day.

Looking ahead, I am committed to living as an upstanding citizen and a present, dependable family man. I intend to continue contributing to my family's insurance business, and if the Court permits, I hope one day to pursue my longtime dream of starting a small business offering electronic repair and web development services. My personal goals are equally clear. I plan to marry Melanie, to provide a stable and loving home for Delson, and to build the life that I know I can live. My path forward is defined by contribution, not harm.

I throw myself on the mercy of this Court, not to escape punishment, but to demonstrate that the person standing before you today is entirely committed to lifelong rehabilitation, making amends, and living as a law-abiding, productive member of society.

Respectfully Submitted,

AuthentiSIGN
JOEL MARTIN EVANS

Joel Martin Evans
08/12/26 9:38 AM EDT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

AHMED HOSSAM ELDIN ELBADAWY, et al.,

Defendants.

Case No. 2:24-CR-595-JWH-4

# EXHIBIT C

Letter of Tracy Iovanna to Judge Holcomb

August 12, 2026

From: Ms. Tracy Iovanna

To: The Honorable John W. Holcomb
Ronald Reagan Federal Building
411 W 4th Street
Santa Ana, California 92701

**Re: United States v. Elbadawy, Case No. 2:24-cr-00595-JWH**
**Leniency Letter for Joel Martin Evans**

Your Honor,

My name is Tracy Batts Iovanna. I write this letter to humbly request leniency during the upcoming sentencing of my youngest son, Joel Martin Evans.

For 15 years, I have owned and operated Wagoner Insurance, a woman-owned business in Sneads Ferry, North Carolina. For over 14 years, I was married to Cletis Evans, a retired Marine Captain. Together, we share three children: Jordan (34), Jesse (32), and Joel (27).

As the spouse of an active-duty Marine, our family moved frequently. We relocated from Camp Lejeune, North Carolina, to Okinawa, Japan, where Joel was born in 1999. We then transferred to Quantico, Virginia, before returning to Camp Lejeune. In 2002, when Joel was three years old, his father deployed back to Okinawa for a year. Upon his return in 2003, Cletis and I chose to separate.

To ensure our children remained our absolute world, Cletis lived in a home just 400 yards down the road. We maintained an excellent, amicable relationship. Even today, we communicate constantly and stand entirely unified regarding our adult children. We raised Joel in a loving network within the Sneads Ferry community, ensuring he had every opportunity to learn in school and participate actively in church.

Like any family, our children have faced individual struggles, and Joel is no exception. Upon graduating from Dixon High School in 2017, Joel elected to stay at home for a year. He applied his self-taught technological skillsets to designing and creating websites for local, small-town businesses. He even designed the current Wagoner Insurance website where he works today.

After a period of living in Kentucky, Joel returned home to North Carolina. At his brother's wedding, he met and fell deeply in love with his girlfriend, Melanie. Though she was older and already had a child, Joel adapted beautifully to this sudden responsibility. He has had an immediate, profound impact on helping Melanie raise her son, Delson, who is now in grade school. From teaching Delson his first words and letters to supporting his schooling today, Joel has proven to be an invaluable, nurturing asset to this young boy's life.

A few years ago, Joel was struggling severely to make ends meet. While I initially enabled him by paying his rent, I ultimately decided to push him toward independence. I hired him at my agency and insisted he take his insurance license test. After becoming a licensed agent, Joel stepped up tremendously to handle a massive workload in our office. This arrangement allowed me to deduct rent directly from his pay, teaching him true accountability.

Joel quickly became an indispensable asset to our office, but more importantly, to the over 300 customers who frequent our business each month. He instantly grasped the complexities of various insurance lines and developed an innate ability to connect authentically with clients to meet their needs. Over the last 15 months, he has built his own loyal clientele. Joel has adapted so exceptionally well that he has earned my complete operational trust. Just last week, while my church went on a 9-day mission trip to Peru, Joel managed and ran our entire office completely on his own.

I harbor no illusions about the severity of my son's actions. I know Joel committed a serious crime that brought direct, lasting harm to real people and businesses. As a business owner, I know firsthand that I would be furious if this happened to me. My heart goes out completely to the victims impacted by his poor decisions.

Cletis and I have always stood together when counseling or disciplining our children, but we both firmly believe that as adults, they are ultimately responsible for their own actions. Joel makes absolutely no excuses for what he did. He is entirely undone by his choices, deeply regrets his actions, and wishes more than anything that he could undo the damage he has caused.

It was the most horrific scene of my life to see my son in shackles like a hardened criminal when Joel made his first court appearance in Wilmington, NC. Yet, from that moment, he has faced his reality head-on. He chose to bypass a trial, plead guilty immediately, and cooperate fully with the government to assist in securing the arrests of others and ensuring victims are made whole.

Joel made a monumental mistake, but he understands the consequences and is fully committed to making things right. While his conviction means he may no longer be able to sell insurance, I know he remains a valuable asset to our company, our clients, and his family. I recognize that Your Honor must hand down a just sentence. However, I respectfully ask for the court's leniency to sentence Joel to probation with a suspended sentence of incarceration. This structure will serve as a powerful deterrent while allowing him to stay here in North Carolina under our direct family supervision.

It will permit him to continue working, provide a stable home for Melanie and Delson, and utilize his technical skills to assist his father's volunteer web development work for Veteran Service Organizations. Between his father and me, Joel has an unwavering safety net. I guarantee he will strictly abide by every rule of his court-ordered supervision as he grows past this terrible mistake.

Thank you, Your Honor, for your time, your dedicated service, and your compassionate consideration.

Respectfully submitted,

AuthentiSIGN
Tracy Iovanna

Tracy Batts Iovanna
Owner, Wagoner Insurance
08/12/26 2:25 PM EDT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, Case No. 2:24-CR-595-JWH-4

Plaintiff,

v.

AHMED HOSSAM ELDIN ELBADAWY, et al.,

Defendants.

# EXHIBIT D

Letter of Cletis Evans to Judge Holcomb

5810
26223/001
11 Aug 26

From: Captain Cletis S. Evans, Jr (USMC/Retired)
To: The Honorable John W. Holcomb
United States District Judge
Ronald Reagan Federal Building
411 W 4th Street
Santa Ana, California 92701

Subj: **USA v. ELBADAWY, et al, CR No. 2:24-CR-00595-JWH**

Your Honor,

I am writing this letter as a deeply concerned father, a retired United States Marine with 22 years of active-duty service, and a citizen who believes profoundly in accountability, discipline, and right from wrong. My youngest son, Joel Martin Evans, has pleaded guilty to Conspiracy to Commit Wire Fraud in the subject case. I offer no excuses for his actions. He violated the law, and he must face the consequences of those actions. However, I am writing to provide Your Honor with a complete picture of his character, his profound remorse, and his potential for complete rehabilitation.

Growing up in a household shaped by military values, Joel was taught the vital importance of integrity and personal responsibility. When he fell short of those values, it was devastating to our entire family, but most importantly, to the victims of this offense. This two-year ordeal has been earth-shattering for us, but I recognize that it has been far more destructive to the individuals who suffered financial and emotional harm. They deserve closure, and Joel understands that completely.

I have witnessed Joel's genuine transformation firsthand. In 2024, immediately following his arrest by the FBI, I picked him up from the New Hanover Detention Facility in Wilmington, North Carolina. During the drive to his mother's house in Sneads Ferry, Joel broke down in tears. He was not crying out of self-pity; he was consumed by anger at his own actions, deep sorrow for the people he had hurt, and the heavy realization of the disappointment he had caused to our family.

Authentisign ID: 34392E54-B295-E111-9B33-000D3A4EE82A


During that drive, I looked my son in the eye and told him exactly what he needed to do. I instructed him to throw himself at God's mercy first, and then to cooperate fully with the government to ensure everyone involved was held accountable and that the victims could be made whole. Without a lawyer present or any coercion, Joel agreed instantly. When I subsequently retained counsel for him, my explicit instruction was that we would not go to trial to fight the charges but rather focus entirely on how Joel could assist the government and make amends. He has fully embraced that path of cooperation and accountability.

I truly believe this conduct was an isolated, one-time error in judgment where he was caught up in the moment, rather than a reflection of who he is as a man. Today, he is fully prepared to accept an appropriate punishment. I humbly ask Your Honor for mercy in fashioning a sentence, perhaps utilizing probation and a suspended sentence as a strict deterrent.

Joel has learned a profound lesson, and I need him here to continue his rehabilitation through service. I actively support several Veteran Service Organizations that lack any digital presence, and I rely heavily on Joel's technical skills to help build and manage websites for these groups. Keeping him in the community will allow him to use his skills to give back, support veterans, and work diligently toward any restitution ordered by the court.

Thank you, Your Honor, for your time, your service to our justice system, and your compassionate consideration of my son's sentence.

Respectfully submitted,

AuthentiSIGN
Cletis Evans

Cletis S. Evans, Jr.
Captain/USMC/Retired
ESWS '91 – LST-1194
08/11/26 2:29 PM EDT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, Case No. 2:24-CR-595-JWH-4

Plaintiff,

v.

AHMED HOSSAM ELDIN ELBADAWY, et al.,

Defendants.

# EXHIBIT E

Letter of Crystal Prince to Judge Holcomb

From: Mrs. Crystal Prince

To: The Honorable John W. Holcomb
Ronald Regan Federal Building
411 W. 4th Street
Santa Ana, California 92701

**RE: United States v. Elbadawny, Case No. 2:24-cr-00595-JWH**
**Leniency Letter for Joel Martin Evans**

Dear Judge Holcomb:

I am writing to respectfully share my personal and professional perspective regarding Joel Martin Evans and the positive impact that he has on both our workforce and our community. I have had the opportunity to get to know Joel closely through a professional relationship and by living in the same community. I believe it is important for the Court to understand the unique role he plays in the daily lives of the people around him.

Professionally, Joel is an extremely valuable member of our workforce. He is dependable, hardworking, and carries significant responsibilities that directly affect the success and daily operation of his family's insurance business. His technical knowledge, experience, and strong work ethic are not easily replaced. More importantly, people depend on him—not only for the specific work he performs, but also for his leadership, reliability, and immediate willingness to step in whenever someone needs help.

His importance extends well beyond the workplace. Joel is a contributing, proactive member of our community. He has built strong relationships with customers, coworkers, local businesses, friends, and neighbors, proving himself to be someone others know they can depend on. In a smaller community, individuals who consistently work, contribute, support others, and invest themselves in the people around them make a meaningful difference.

I want to state clearly that I am fully aware Joel has pleaded guilty to Conspiracy to Commit Wire Fraud. My intention in writing is not to excuse, minimize, or condone the circumstances that brought him before your Court. Rather, I respectfully ask that you consider the "whole person" and the positive, honest contributions he continues to make every day.

An extended absence would affect far more than just Joel; it would have a devastating impact on the family business, the coworkers who depend on him for operational stability, the customers who rely on his daily service, and others within the community.

I believe strongly that a person's value should be measured by what they contribute to the lives of others. From what I have personally witnessed, Joel is someone whose presence, work, and daily contributions genuinely matter to our local economy.

Thank you for taking the time to read this letter and for considering my perspective as you determine a just sentence.

Respectfully Submitted,

AuthentiSIGN
Crystal Prince

Crystal Prince
Owner, Prince Septic & More, LLC
08/12/26 5:51 PM EDT